HILLYER, DEUTSCH, EDWARDS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 36893, 42168.   Promulgated November 28, 1930.

*John J. Finnorn, Esq.,* for the petitioner.
*Brooks Fullerton, Esq.,* for the respondent.

454

OPINION.

Love: The issues here involve the amount, if any, of depreciation and depletion, or rather the exhaustion of the value of the Southwestern Co. contract, which petitioner is entitled to deduct from its gross income for the calendar years 1923 to 1926, inclusive. The amounts deducted by petitioner in its income-tax returns and the amounts allowed by the respondent in his deficiency letters have been set out in our findings. The amounts now claimed by petitioner, as alleged in its petitions, are as follows:

| Calendar year | Depreciation | Depletion (approximate) | Total (approximate) |
|---|---|---|---|
| 1923 | $47, 036. 11 | $99, 395. 99 | $146, 432. 10 |
| 1924 | 52, 572. 45 | 58, 774. 36 | 111, 346. 81 |
| 1925 | 43, 601. 67 | 28, 634. 32 | 72, 235. 99 |
| 1926 | 49, 006. 59 | 49, 453. 33 | 98, 459. 92 |

On the other hand, the respondent, at the close of the hearing, moved that the deficiencies as determined by him be increased, on the ground that petitioner was not entitled to any deduction for either depreciation or depletion in any of the years now before us. We shall consider first the respondent's motion as it relates to depreciation. In so doing, we will, for illustrative purposes, use only the facts contained in the respondent's explanation of how he determined the depreciation allowance for the year 1923, since the principles involved apply alike to all of the years now before us.

The facts upon which the respondent based his allowance for depreciation of physical assets in his deficiency letter for the year 1923, and the method used by him, have been set out in our findings. We have also set out therein the facts upon which petitioner relied in support of the allowance contended for by petitioner. An examination of the facts and method used by respondent and the facts and method contended for by petitioner, indicate that the method

employed by each is the same, namely, the determination of a reasonable allowance for depreciation according to the so-called " unit-of-production " basis. This basis or method has from time to time received our approval as constituting a reasonable basis or method for determining the allowance provided for in the respective statutes. See *Glady Manufacturing Co.*, 1 B. T. A. 337; *Golconda Oil Co.*, 7 B. T. A. 955; *Colmer-Green Lumber Co.*, 12 B. T. A. 256; *Paul B. Ray*, 20 B. T. A. 453; and *Duvin Coal Co.*, 16 B. T. A. 194. The only difference between the two computations is that the respondent determined the salvage value of the equipment to be $40,270.64, and averaged the additions of $4,107.33, made during the year 1923, whereas the petitioner alleges that the salvage value was not more than $5,000, and contends that the additions to the physical equipment for the taxable year should not be averaged in determining the unit rate of depreciation and, if such additions should be so averaged over the year, the number of feet of timber acquired during the year should also be averaged.

The respondent contends that not only should the petitioner be denied any further allowance for depreciation, but that the amounts determined as allowable by him should now be disallowed on the ground that petitioner has failed to prove all of the factors which would enter into the computation, such as the original cost of the property, subsequent additions, *et cetera*. We do not think that, under the circumstances of this case, the pleadings placed in issue any of the factors except the salvage value and the proper treatment of the additions made during the year. The evidence relative to the salvage value of the physical assets clearly proves that such value was not more than $5,000, and we so find. With respect to the proper treatment of additions during the year, including both the additions to the physical property of $4,107.33, and the additions to the timber to be cut of 33,901,051 feet acquired during the year, we think that, in the absence of evidence showing the exact date or dates such additions were made, such additions should be averaged over the entire year, that is, the physical equipment account at the beginning and end of the taxable year should be added together and divided by two, and likewise, the quantity of available timber at the beginning and end of the taxable year should also be added together and divided by two. Cf. *Robert P. Hyams Coal Co.*, 1 B. T. A. 217, and *Spang-Chalfant & Co.*, 9 B. T. A. 858.

This brings us to the consideration of the depletion or rather exhaustion of the contract with the Southwestern Co.

Petitioner originally contended in its petitions that the Sabine Co. (Texas company) liquidated in 1917 and assigned the March 15, 1916, contract along with its remaining assets to a partnership composed of the stockholders of the Sabine Co. (Texas company) and

that the partnership then organized the petitioner and assigned the said contract to it. Petitioner now concedes that the March 15, 1916, contract remained the property of the Sabine Co. (Texas company) until July 1, 1920, when the three-party agreement was entered into. Petitioner now contends that the March 15, 1916, agreement was modified with respect to the price to be paid for stumpage and the elimination of Article III, section 3, thereof, prior to the moment it was assigned to petitioner; that it was then assigned to petitioner in the modified form; that it was assigned for no consideration; that it was, therefore, a gift to petitioner; and that the fair market value of the contract at the date of gift for exhaustion purposes was somewhere between $400,000 and $600,000. ·

The respondent in his deficiency letters determined that petitioner was entitled to deductions from gross income on account of the exhaustion of the contract under the heading of depletion, and allowed deductions for each of the taxable years now before us, based upon a valuation of the contract of $119,000. He now contends that the July 1, 1920, agreement amounted to a novation of the March 15, 1916, agreement; that the July 1, 1920, agreement was an arm's-length agreement with the Southwestern Co. which was acquired by petitioner without any cost; that, therefore, petitioner was not entitled to any deduction on account of the exhaustion of the contract; and that in any event petitioner has failed to prove a value in excess of the $119,000 value determined by the respondent.

Article 2185 of the Revised Civil Code of Louisiana, defines novation to be a contract consisting of two stipulations; one to extinguish an existing obligation; the other to substitute a new one in its place. Article 2187 of the same code provides:

The pre-existent obligation must be extinguished, otherwise there is no novation; if it be only modified in some parts, and any stipulation of the original obligation be suffered to remain, it is no novation.

A reading of paragraph 2 of Article I of the July 1, 1920, agreement, set out in full in our findings, makes it very clear to us that the parties did not intend to extinguish the March 15, 1916, agreement, but, to the contrary, " the Assignee hereby accepts said agreement and assumes and agrees to observe and discharge all of the conditions and obligations in the aforesaid agreement, as herein modified  *  *  *." We do not, however, agree with the petitioner that the March 15, 1916, agreement was first modified and then assigned to petitioner. The modification and assignment were by the terms of the agreement itself simultaneous.

Sections 204 of the Revenue Acts of 1924 and 1926 provide that the basis upon which depletion, exhaustion, wear and tear are to

be allowed in respect of property acquired after February 28, 1913, shall be the cost of such property, except that:

If the property was acquired by gift or transfer in trust on or before December 31, 1920, the basis shall be the fair market value of such property at the time of such acquisition.

The same rule applies under the Revenue Act of 1921, except that there is no restriction that the gift be made " on or before December 31, 1920." It may be before or after that date. See *Charles G. Barnes et al.*, 8 B. T. A. 360, and *Magdaline McKinney et al.*, 16 B. T. A. 804.

With respect to the fair market value of the contract at the time acquired on July 1, 1920, we do not think petitioner has overcome the determination made by the respondent, which is prima facie correct. Petitioner's evidence consisted of the testimony of F. L. Hillyer, who is petitioner's secretary, and Percy C. Smith, an attorney. Hillyer's testimony was devoted principally to pointing out the provisions in the contract which were advantageous to the Sabine Co. (Texas company) and, hence, to the petitioner. We are satisfied from Hillyer's testimony that the contract contained provisions which were advantageous to petitioner, but the question before us is what a willing purchaser, not compelled to buy, would pay a willing seller, not compelled to sell, for such a contract. Hillyer gave no testimony along that line except that he did say that $6 for pine, $4 for white and red oak, and $2 for all other timber on July 1, 1920, " was a very cheap price." These were the prices for stumpage provided for in the July 1, 1920, agreement. The best that we could say for Hillyer's testimony is that it furnished support to the respondent's determination of a $119,000 value. It certainly did not show that value to be erroneous.

Smith testified as an expert. He was a lawyer by profession and had practiced law for 20 years, during which time about 90 per cent of his business had been with timber companies. On direct examination he testified that in his opinion the contract in 1920 was worth about $500,000. But on cross and redirect examination the witness so discredited his testimony that very little weight can be given to it. When asked on cross-examination whether he understood that the $500,000 he had testified to was the amount of profit which he thought petitioner might reasonably expect to make upon the cutting and marketing of the timber left standing in 1920, Smith answered:

Well, no, I don't know. I can't answer that question. I don't know what they get for their lumber, but of course they get different prices for it, but I don't know what profit they have made, or contemplate making; but taking everything into consideration, just as though it was now 1920, I would say

that a contract of all of the conditions that existed then, would be worth $500,000.

He then testified that if he had contemplated taking over the contract as it was modified on July 1, 1920, he could reasonably expect to make " over a period of several years, with first-class equipment and good management, $600,000," after which the cross-examination continued as follows:

Q. Well, now, considering that $600,000 would have been a reasonable estimate of the total profit one could expect to make, under the conditions as set forth in this contract, how much of that profit would a buyer be willing to pay to the Hillyer, Deutsch, Edwards Company as a bonus or premium for the contract on July 1, 1920?

A. Now, Mr. Fullerton, that is a question that is hard to answer. To step out on the street, or in the open market, and offer for sale a contract involving some $600,000 or $700,000 or $800,000, is a little bit unusual, *and I doubt if one could have stepped out on the street, in the open market, and sold that contract for anything like that.* But they had a right, reasonably, to contemplate that, over a period of years, they would receive a legitimate profit of about $5 a thousand, over and above the cost of the stumpage and logging and milling and overhead.

Q. Well, you would wish us to understand, would you not, that this $600,000 profit to be made—that anyone who was willing to pay a bonus for the contract, would not be willing to pay the entire amount of the profit he eventually expected to get, as a bonus?

A. No.

Q. Otherwise, he wouldn't make anything?

A. No, sir.

Q. If you had been in position to buy this contract and had the money to buy it with, how much of the $600,000 eventual profit would you have been willing to pay as a bonus for the contract?

A. Now, Mr. Fullerton, that is a little bit bigger proposition than I ever did go into myself, and I think I would have to have some time to figure on it, if I were going into it, myself, *and get the counsel and advice of some others. I wouldn't want to go into a proposition that big, myself, without getting some counsel from some business man, or business men.*

Q. Well, would you—would any reasonable man expect to pay as a bonus five-sixths of the entire profit he eventually expected to make?

A. *Oh, no, of course not.* (Italics supplied.)

In continuing the cross-examination, Smith testified that he did not understand that the value he was placing on the contract was the value that a willing buyer would pay for it and stated " I don't know what it would be worth to a willing buyer. * * * "

On redirect examination, Smith thought that, on account of the advantages which petitioner enjoyed under the contract, petitioner ought reasonably to expect a profit of almost $1,000,000, or $960,000 over the period of years, " and I should imagine—I believe, if they could have gotten in touch with the right people and offered that contract for sale to people that understood it, people in the business, a willing buyer would have been willing to pay $450,000 for

that contract, or $400,000 anyway." When the latter testimony is compared with his previous testimony, that with "first-class equipment and good management" one could reasonably expect to make out of the contract over a period of years only $600,000; that he did not know "just what would be considered a willing buyer under the circumstances"; and that he did not know what the contract would be worth to a willing buyer, it seems to us, that, considering the entire record, petitioner has failed to overcome the prima facie determination of value made by the respondent. We, therefore, sustain the respondent's determination on this point.

The deficiencies should be redetermined in accordance with this opinion.

*Judgment will be entered under Rule 50.*